# MIDWAY REALTY COMPANY v. CITY OF ST. PAUL.[1]

January 8, 1915.

Nos. 18,907—(136).

**Finding sustained by evidence.**

1. The evidence justifies a finding that the tax certificates and tax deed, through which appellant claims title to the parcels of land in controversy, were derived from dealings in tax certificates and tax matters concerning the same land, and other lands, within the terms of a certain written contract made between appellant's grantor or assignor and two other persons in the name of one Covell.

**Same.**

2. The finding is also sustained that the one who negotiated with the city of St. Paul to sell or exchange said parcels of land was authorized by the others interested therein to make the deal.

**Specific performance — evidence.**

3. The city, having been permitted to go into possession under the contract and make valuable improvements upon the land, is now entitled to a

[1] Reported in 150 N. W. 615, 151 N. W. 142.

conveyance thereof, it being all the time ready and willing to perform according to contract. The reception in evidence of a preliminary written proposition to deal with the city, if error, was without prejudice.

Application to the district court for Ramsey county by the Midway Realty Co. to register title to certain land. The city of St. Paul in its amended answer set up an agreement with the applicant's grantor to purchase the premises in question, and prayed that if the title were registered it be registered for the use and benefit of the city of St. Paul, and if registered in the name of the applicant that it be registered subject to the agreement to convey the premises to the city free from incumbrances. The matter was tried before Catlin, J., who made findings and as conclusion of law found that applicant was the holder of the legal title to the real estate, subject to the rights of the city of St. Paul in and under the contract of purchase, and other enumerated liens. From an order denying the motion of the applicant for a new trial, the Midway Realty Co. appealed. Affirmed.

*William G. White,* for appellant.

*O. H. O'Neill* and *J. P. Kyle,* for respondent.

HOLT, J.

This is a proceeding to register title to land. The applicant was found to be the holder of the legal title subject to a contract under which the city of St. Paul, upon the payment of $750 and the delivery of a deed to certain lots, will become the owner and entitled to a deed from the applicant. Certain assessments and tax liens held by the city were declared superior to the legal title of the applicant. Of this there is no complaint, if the asserted contract of the city be sustained. The land in question is located in the north half of a block in the city of St. Paul, which block is bounded by Beech street on the north, by Frank street on the east, by Margaret street on the south, and by Earl street on the west. The site of Sibley school takes in the east third of the block. The south half of the remainder is platted into ten 40-foot lots, fronting on Margaret street; and the north half thereof, fronting on Beech street, is the property involved,

with the exception of a 40-foot strip known as the Kromschroeder lot which separates this land into two parcels, the east parcel having a frontage of 120 feet on Beech street and the west parcel a frontage thereon of 240 feet. The whole amount would make 9 lots, 40 feet front by 139 feet deep. By this appeal from the order denying the applicant a new trial nearly all the findings, 22 in number, are attacked. However, it all centers upon those leading to the conclusion that the city has an enforceable contract for the purchase of the parcels described. We shall not attempt to fully detail the facts, but rest content with reciting so much of the important features of the case as, in our view, control the result.

In 1906, when about to acquire a large number of tax certificates, and tax receipts and deeds, for various years, upon sundry lots and parcels of land in Ramsey, and three adjoining counties, Robert L. Ware made an agreement with Charles L. Covell, whereby, in consideration of $4,522.53 to be paid on or before three years from November 15, 1906, he bargained, sold, conveyed and assigned the same to Covell. A description of the lots and parcels to which the certificates, deeds and receipts pertained was contained in a schedule attached to the agreement. The agreement or contract is herein referred to as Exhibit 6. It is evident that the intention was that the purchase price was expected to be paid out of what might be realized from these tax matters, for Covell agreed to reduce the certificates to cash, to free the several parcels from adverse liens, to quiet title and to register the title to the tracts wherein it was quieted. There was no personal obligation to pay the several specified amounts, except as made out of the tax matters. An examination of the schedule indicates that the sum to be paid Ware was but 60 per cent of the amount then due upon the certificates, or upon the amount to be realized if redemption was made. The contract contained a provision under which Ware was to retain possession of the certificates, etc., as a lien or security for the payment of the purchase price mentioned. Covell had also the privilege to substitute other certificates, not here important perhaps, and to secure the release of any one parcel upon payment of the amount due thereon with 6 per cent interest. This amount was 60 per cent of the amount indicated in

dollars and cents after each parcel on the schedule. Ware was given a first lien upon any and all proceeds of said certificates, and upon receipts and deeds, and upon all redemptions or sales of the same, and upon any lands or other property of whatsoever nature into which the same might be converted.

It was found by the court that in this contract, as well as in all dealings thereunder, Covell was a mere figure head, permitting A. M. Lawton and Lloyd Peabody to use his name, they being the ones who in reality contracted with Ware, and who, under the name of Covell, acted for themselves in all dealings in respect to the lands covered by the contract. This finding cannot be assailed.

In 1902 these parcels were sold to one Gaskell for the taxes of 1900. Whether the certificate thereon was superior to the certificates originally held by the Knowltons and received by Ware at the time Exhibit 6 was executed, does not appear and is unimportant. Gaskell in March, 1906, instituted an action against the then record owner of these parcels, and others claiming an interest therein, which terminated in a decree adjudging the title in Gaskell subject to the city's lien for local assessments. The real parties to Exhibit 6 by quitclaim from Gaskell to Covell acquired the benefit of the decree.

The taxes for 1906, and several prior years, being delinquent, Lawton and Peabody, acting under the terms of Exhibit 6 and with moneys realized thereunder, purchased from the state at a forfeited tax sale, held November 20, 1907, the parcels here involved, taking the certificates in the name of Ware, without his knowledge, but for the purpose of protecting themselves and as additional security to Ware under the contract. Thereafter Lawton and Peabody procured notice of redemption to be given, and, no redemption being made, obtained on September 30, 1909, the governor's deed to these parcels, causing the name of Ware to be inserted as grantee without his knowledge. The possession of this deed was always retained by Peabody until delivered to William G. White in December, 1911, and it was not recorded until later.

Prior to the execution of the Governor's deed, and on January 25, 1909, Lawton and Peabody began a proceeding to register the title to the parcels here involved in the name of Covell. This was pursu-

ant to the terms of Exhibit 6. The legal title was then of record in Covell. The proceeding was pending until this trial.

While the title in the register of deeds office thus appeared in Covell, and on October 4, 1909, Lawton, with Peabody's consent, began negotiating a deal with the city of St. Paul which was concluded on December 23, 1909, whereby the city agreed to acquire this land for public playgrounds and to pay therefor $750 in cash, and deed some lots already owned by the city, but not as available for the intended use. The city went into possession of these parcels the next summer, graded them, and erected thereon a shelter house, all at the cost of several thousand dollars. The city, at all times since July 1, 1910, has had the actual, open and exclusive use of this land. The deal with the city, as finally accepted, also included the Kromschroeder lot, referred to above, and the 10 lots south of these parcels in controversy. The transaction has been fully carried out as to all the property except the parcels here in question. The city is ready and willing to perform as to them by paying the agreed price and delivering the deed to the lots to be traded in.

On December 18, 1911, Ware assigned and transferred his rights under the contract (Exhibit 6) to William G. White through whom the applicant claims. In so doing White agreed to hold Ware harmless from any consequences which might result from the assignment, and the latter agreed to execute such further and additional conveyance of the property as might be necessary to carry out the purpose of the assignment. Pursuant to this agreement, and at the request of White, Ware and wife, on February 20, 1913, quitclaimed to the applicant.

To us, but three vital propositions appear in the case, viz: Were the parcels in question covered by Exhibit 6? Was Lawton thereunder authorized to contract with the city? Has the city an enforceable contract?

The court finds that tax certificates upon the parcels involved were included in Exhibit 6. This is vigorously challenged. We think the finding right. Upon the schedule attached to the exhibit, and therein referred to as item 108, we find: "768 —— Beech Street Property No. 65428 ——— $654.67." It is possible this was overlooked by the attorneys at the trial. The parcels here in question front on Beech

street, and there is no evidence that any other tract of land on that street was covered by any tax certificate acquired by Ware. There is ample testimony that the tax certificates covering this property were among the instruments turned over to Ware, nominally, to Peabody, actually, when Exhibit 6 was executed. Under that contract, Lawton and Peabody were required to protect not only their own interests, but that of Ware against subsequent taxes; they were authorized also to clear the title, have it registered, and realize on the property. No matter how this was done as between Lawton and Peabody (in the name of Covell) on the one hand, and Ware on the other, Exhibit 6 determined their respective rights. Ware never gave these matters any attention. He trusted the others to look out for his interest. Peabody was a lawyer. He attended to all legal matters pertaining to the interests growing out of Exhibit 6. During all the time, and until the transfer to White, Peabody kept possession of all the certificates, receipts and other documents relating to all the property covered by the exhibit mentioned. No matter in what name the tax deeds, tax certificates, or the title appeared in any step taken in virtue of Exhibit 6 upon property embraced in it, as between the real parties to that contract, Lawton and Peabody on the one hand and Ware on the other, the latter had merely a lien or security thereon for the payment of the money the former were to pay. Whatever title or interest in the land was contained in the certificates, or which could utimately be established through them, was in Lawton and Peabody under the provisions of the contract. Exhibit 6 was never terminated by any overt act of Ware, until long after the city had acquired its rights.

We also think A. M. Lawton was authorized by his associates to deal with the city. He was in the real estate business. His duty in the transactions relating to certificates or titles covered by the contract seems to have been that of sales manager. Peabody sanctioned the trade. The only doubt he now casts upon its being agreed to by all, is by his testimony that when he laid it before Ware, he seemed to find some objection, and that Peabody informed Lawton that it was necessary to obtain Ware's approval. The three without doubt conferred about it. Ware never positively disapproved. The

court has found, in substance, that Ware authorized or acquiesced in everything Lawton did in the premises. The finding is supported. Not only did Ware's contract give the other parties to it a wide latitude in converting the tax certificates into cash or into marketable titles, but whatever check the contract gave Ware upon their doings, he surrendered from the very first. He never took possession of a single certificate or document. Not only the certificates and instruments pertaining to the taxes upon the property included in the contract, but the contract itself, were always in Peabody's hands. Upon the trial Ware disclaimed any right to dictate what disposition should be made of any particular tract. All he looked for was that he should obtain from each lot or parcel the percentage of the amount indicated by the schedule as the tax lien thereon. He trusted to Peabody that nothing would be done in impairment of his lien or interest. It may also be held that the contract in effect created a sort of partnership between Lawton, Peabody and Ware in respect to the tax matters and titles therein included in which the management was left to Lawton and Peabody. And further it is not made to appear that the agreement with the city to any extent impaired Ware's lien or security. What his successor now obtains from the city may be more than the amount Ware was to have out of these two parcels.

Is the city in position to assert its rights to a conveyance under the arrangement made through Lawton? The city's power to buy the property for the use made of it is not questioned. But it is said the original proposition, Exhibit 8, from Lawton was not the one finally accepted; and that Exhibit 8 was rejected and no written proposition was proven of the deal as acceded to by the city. The contention has no merit. It is true that the city declined to proceed with the negotiations, unless it could acquire the whole block west of the school site. Lawton then assured the city that he could deliver the three lots not mentioned in Exhibit 8. This offer the city accepted. It has acquired all the lots except the tracts in controversy. The city was permitted to go into possession of these and has expended large sums in improving the same. It has always stood ready to complete the deal as agreed. Brown v. Hoag, 35 Minn. 373, 29 N. W. 135; Mournin v. Trainor, 63 Minn. 230, 65 N. W. 444; Ferguson v. Tro-

vaten, 94 Minn. 209, 102 N. W. 373. We think the other parties to the agreement, Lawton, Peabody and Ware, are not now in position to interpose the statute of frauds as a shield, and the doctrine of *ultra vires* does not apply. The applicant is in no better position than Ware. The city's possession and use of the premises has, ever since prior to July, 1910, been full constructive notice of its rights. Furthermore the agents and parties in interest with the applicant had actual notice. Peabody has still some interest with the applicant in the premises. It is true that the applicant in an action to quiet title has extinguished the rights of Covell in the property and thereby the interest of Lawton and Peabody. But the city was not a party to that suit, and its rights were in no manner affected.

A point is made against the reception in evidence of Exhibit 8, the written proposition under which the negotiations for the property started. The exhibit was one of the steps taken in the deal, it concerns the land in question. Whether it was rejected or merely modified is not now important for, after the city accepted the proposition, which as to these lands is exactly the same as in Exhibit 8, there has been possession with such part performance that the city may insist upon a deed, it being ready and willing to give the agreed consideration therefor.

Order affirmed.

HALLAM, J., took no part.

On March 1, 1915, the following opinion was filed:

PER CURIAM.

Upon the petition for reargument: Ware's contract cannot be classified as one between vendor and vendee for the sale of land. It provides that Ware shall have a "first lien upon any and all proceeds of said certificates and receipts and deeds, and upon all redemptions or sales of the same, and upon any lands, or other property of whatsoever nature, into which the same may be converted." Under this provision if title to any parcel of land covered by a tax certificate was perfected Ware had a first lien thereon for the amount of the

redeemable value of such certificate. We think the contract, especially in the light of the construction placed thereon by the subsequent acts of the parties, may well be said to partake largely of a partnership, as well as of an agency agreement, and only remotely, or in certain contingencies, does it concern title to land.

We believe it can be demonstrated that the contract, Exhibit 6, included tax certificates upon the property in dispute. The total of the amounts upon which the contract price was calculated, as shown upon the schedule A attached thereto, includes the $654.67 upon the Beech street property. The trial court found that certificates upon this property were covered by the contract. Whether this was done without noticing this particular item of evidence does not matter, it is in the record and supports the finding. We may add as to Exhibit C, which plaintiff insists contains the true schedule in reference to which the parties contracted, that thereon is noted, in red ink, that from it certificates upon descriptions marked with a cross were transferred to the Schedule A annexed to the contract Exhibit 6. And upon Schedule A are the amounts of the redeemable value of the certificates upon each description of land also written in red ink. Sixty per cent of $7,537.55, the totals including this $654.67, is the exact amount which under the contract Ware was to receive. That this Exhibit 6 with attached Schedule A was the final contract covering all the tax matters is thus clearly proven not only by the signatures thereto but by the reference to it in Exhibit C and by the computation of the purchase price. We wish also to call the attorneys' attention to the handwriting of a deduction of $148.58 at the end of Schedule A made by the same one who, it is insisted, used Exhibit C as the sole basis of the contract.

We see nothing in the proposition that as agent, partner, or a contracting party Lawton was disloyal to either Peabody or Ware in the deal with the city. The matter is sufficiently touched upon in the opinion. Under the provisions of the contract title might be perfected to any tract of land covered by a tax certificate, or, with Ware's consent, the certificate might be converted into other land, and thereupon Ware held a first lien thereon for the amount coming to him upon the certificate. For aught that appears Ware has an

ample lien in the $750 and the lots the city is ready to turn over under its contract.

The city was in possession and this constituted notice to all the world of its rights. The right to a conveyance need not rest upon a formal contract on file with the proper city official. But we are satisfied that the agents and officers of the appellant had knowledge of the agreement Lawton made with the city, aside from the fact that the expensive buildings and improvements for playground purposes indicated plainly through what department the city's claim to the property could be fully ascertained.

Time was nowhere made the essence of the contract and it cannot be held that it terminated before the deal with the city was made.

The petition for re-argument is denied.